# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TIMOTHY COTTON,                          )
              )
  Plaintiff,                   )
              )
v.                                       )    **Case No. 3: 21-cv-00712**
              )    **Judge Aleta A. Trauger**
WILLIAMSON COUNTY                        )
GOVERNMENT,                              )
              )
  Defendant.                   )

## MEMORANDUM

Before the court is the Motion for Summary Judgment filed by defendant Williamson County (the "County") (Doc. No. 21) (identified in the Complaint as "Williamson County Government"), seeking judgment in its favor on plaintiff Timothy Cotton's claims of race discrimination and retaliation under federal and state law. For the reasons set forth herein, the motion will be granted and this case dismissed.

## I.  FACTS[1] AND PROCEDURAL HISTORY

Plaintiff Tim Cotton, an African American man, was employed by Williamson County beginning in 1991. He was first appointed to the position of judicial commissioner for the Williamson County General Sessions Court in September 2012 by General Sessions Judges Denise Andre and Al Nations. He was appointed to a second two-year term in 2016 by General Sessions

---

[1] The facts for which no citation is provided are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 27) or the defendant's Response to Plaintiff's Statement of Additional Material Facts (Doc. No. 31) and are undisputed for purposes of the defendant's Motion for Summary Judgment.

Judges Denise Andre and Thomas Taylor. This lawsuit arises primarily from the fact that Cotton was not reappointed when his second term expired, in September 2020.

In Williamson County, judicial commissioners are appointed by the two sitting General Sessions Court judges. At all times relevant to the Complaint, judicial commissioners were appointed to four-year terms. Judicial commissioners perform a variety of functions that involve the exercise of independent judgment, all of which fall within the scope of the judges' authority but are delegated to the commissioners. These include setting bonds, making probable cause determinations for arrest and search warrants, and issuing warrants, juvenile petitions and criminal summonses. Once appointed, full-time judicial commissioners can only be removed from office during their term by ouster, governed by Tenn. Code Ann. §§ 8-47-101 *et seq. See* Tenn. Op. Atty. Gen. No. 00-126 (Aug. 7, 2000). Judges of the General Sessions Court can counsel judicial commissioners and provide guidance, but they do not have the authority to terminate the appointment of a judicial commissioner during his or her term. A judicial commissioner's decisions in the performance of his duties are subject to review only by the General Sessions judges and not by other commissioners.

The Williamson County General Sessions Court employs several judicial commissioners at any given time, one of whom is designated as the judicial commissioner supervisor. The supervisor is responsible for scheduling the commissioners' shifts and various other tasks, including counseling the other judicial commissioners about their decisions, but the supervisor does not have the authority to remove another judicial commissioner from office or to alter his work product.

Quentin Henderson became supervisor in 2016. [2] In August 2017, Henderson resigned and Ricky Brown, a White man, was promoted to supervisor. On April 23, 2018, Cotton filed an EEOC charge, alleging discrimination on the basis of race/color and claiming that Williamson County "denied him the opportunity to apply for, and failed to promote him to the position of Supervisor of the Magistrate Office," when Ricky Brown was selected to replace Quentin Henderson in August 2017. (Doc. No. 28-1, Cotton Dep. 124;[3] *see also* Doc. No. 28-9.) The EEOC issued a right-to-sue letter without a finding of discrimination on August 6, 2019, but Cotton did not file a lawsuit within ninety days of his receipt of that notice. The only lawsuit he has filed against Williamson County asserting Title VII claims is the present suit, filed on September 13, 2021.

On August 31, 2018, Cotton engaged in a "prank" involving another judicial commissioner, Matthew Mezzatesta, who has cerebral palsy and challenges with balance. As Cotton was finishing his shift and Mezzatesta was beginning his, Cotton turned off all the lights in the office and hid from Mezzatesta. Mezzatesta tried to call the plaintiff to ask what was going on, but Cotton did not answer. When Mezzatesta proceeded into the office, the plaintiff jumped out to scare him, causing Mezzatesta to lose his balance and fall. The fall resulted in injuries to Mezzatesta that required a trip to the hospital by ambulance.

The plaintiff testified that it was a "regular practice" among all of the judicial commissioners to play pranks on each other (Doc. No. 28-1, Cotton Dep. 142; *see also* Doc. No.

---

[2] Henderson's race is not in the record, but the court presumes that he is White, because it is undisputed for purposes of the Motion for Summary Judgment that "[n]o person of color has ever been appointed Judicial Commissioner Supervisor." (Doc. No. 31, Def.'s Resp. to Pl.'s Statement of Additional Facts ¶ 8.)

[3] The defendant filed as exhibits several deposition transcript excerpts. The plaintiff filed complete copies, in condensed form, of the transcripts of the same depositions and others as well. The court, preferring complete transcripts, refers herein to those filed by the plaintiff. Because the transcripts are in condensed form, the citations are to the original deposition transcript page numbers rather than to the page numbers assigned by the court's electronic filing system.

28-5, Heithcock Dep. 82) and that Mezzatesta wanted to be included in the practice. Cotton at some point counseled him against his doing so, knowing that Mezzatesta had cerebral palsy and difficulty walking. Cotton also admitted that his actions resulted in injury to Mezzatesta and were inconsistent with the expectations set forth by the code of judicial ethics.

Cotton received formal written counseling in connection with the incident involving Mezzatesta (the "Mezzatesta incident"). Cotton refused to sign the written counseling and instead submitted a letter to the General Sessions judges claiming that he was being unfairly targeted, as others also participated in office "pranks," but no one else had been counseled for such behavior. The judges sent Cotton a letter dated September 10, 2018 addressing his response to the counseling. The letter documented the judges' opinion that counseling was warranted by the fact that Cotton's conduct had "potentially resulted in injury to a fellow employee." (Doc. No. 24-2, at 47.) The letter also established that the counseling "did not result in any action adverse to [Cotton], and [would] not result in any so long as the behavior is not repeated." (*Id.*) In addition, Cotton admits that, prior to the Mezzatesta incident, neither Judge Andre nor Judge Taylor was aware that other judicial commissioners engaged in pranks at the office. Cotton is also not aware of any other office horseplay incident or prank that resulted in injuries to anyone.

Judge Taylor testified that the prank and Cotton's response to the counseling made him particularly angry, because Taylor perceived the prank as an instance of bullying a particularly vulnerable individual, and he considered Cotton's response to be insensitive and self-serving. (*See* Doc. No. 29-3, Taylor Dep. at 58 ("I just thought that that was – you know, Mr. Cotton's picking on the most . . . fragile person in that office showed a lack of character that just couldn't be ignored and couldn't be rewarded.").) Judge Andre was also deeply troubled by Cotton's failure to express any remorse for the incident and instead acting defensively. (Doc. No. 28-2, Andre Dep. 111.)

On February 8, 2019, Ricky Brown resigned from his position as judicial commissioner supervisor, and Judges Taylor and Andre selected William "Tommy" Heithcock to replace him. Taylor testified that they selected Heithcock because he was retired law enforcement, and Taylor had known him for thirty years and felt he could trust him. Heithcock had been a detective and a patrolman and was already working as a judicial commissioner. Andre testified that Heithcock was an experienced judicial commissioner who had forty years of law enforcement experience, many of it in the warrants division, and he "had the maturity that [they] were looking for." (Doc. No. 28-2, Andre Dep. 67.)

Cotton did not know that Brown was resigning until Heithcock had already been selected to replace him, so he had no opportunity to apply for the position. On December 6, 2019, Cotton filed a second EEOC charge alleging race discrimination and retaliation in connection with the selection of Heithcock as judicial commissioner supervisor on February 8, 2019.

In January 2020, the Williamson County Mayor's Office received an anonymous complaint about Cotton's sleeping on the job. In response to that complaint, shift changes were made to provide closer supervision of the plaintiff. There is no dispute that Cotton slept on the job while working as judicial commissioner. Between 2014 and 2018, while working the night shift as a judicial commissioner, Cotton also worked a full-time job during the day. Cotton testified that having the full-time day job did not interfere with his ability to work as a judicial commissioner. (Doc. No. 28-1, Cotton Dep. 83.) Asked when he slept, he stated that he slept at night in the judicial commissioner's office "when there was down time and in the evening when [he] got off from the other job." (*Id.*) How much he slept at night in the office "varied depending on how busy the office was." (*Id.* at 84.)

The matter of Cotton's sleeping on the job first came up as an issue sometime between 2012 and 2016, when one of the judges sent a supervisor down to tell him that "an officer had said something about [his] sleeping on shift." (*Id.* at 86.) Quentin Henderson, when he was supervisor, talked to Cotton about sleeping on shift, in response to complaints from officers, and specifically told him, "if [the judicial commissioners on night shift] were going to sleep," they should go "somewhere where the officers didn't see [them] and wouldn't go and complain." (*Id.* at 106.) According to Cotton, although other people also slept on the job, Henderson told him the complaints were only directed toward him. (*Id.*) Henderson also told him that the "judges didn't want to hear complaints about [Cotton] sleeping at work." (*Id.* at 107.)

According to Cotton, it was common practice during his employment for judicial commissioners to rest or sleep when there was down time during the night shift. (*Id.* at 83, 106, 266–70.) That statement is disputed, but the court accepts as true, for purposes of the defendant's Motion for Summary Judgment, that Cotton was not the only judicial commissioner who slept during the night shift. In September 2018, however, shortly after the Mezzatesta incident, then-supervisor Ricky Brown circulated an email to the judicial commissioners about various conduct issues and that specifically included an instruction to "[r]efrain from sleeping while on shift." (Doc. No. 24-3, at 105.) Cotton, therefore, knew no later than September 2018 that sleeping on the job was unacceptable to the judges. He also continued sleeping on the job after that date, and he was counseled about sleeping on the job at least four times. The plaintiff admits that Judges Andre and Tayler were not aware of any other judicial commissioners, other than Cotton, who slept while on shift and that the judges did not authorize judicial commissioners to sleep while on shift.

In June 2020, Zach Beard was selected to serve as interim judicial commissioner supervisor while Heithcock was on medical leave. Cotton objected to Beard's temporary assignment via email

and requested an explanation as to why he had not been considered for the position. On June 3, 2020, Andre and Taylor sent Cotton a memo explaining that Beard was placed in the position temporarily based on their determination that he would best perform the interim functions of supervisor. The memo also states:

> You have been made aware of your own performance issues, including but not limited to a complaint about you sleeping through entire shifts and another incident in which you engaged in horseplay that caused injury to another employee. While we appreciate your years of experience, your job performance does not reflect the leadership skills that are required for the supervisor position.

(Doc. No. 24-1, at 51.)

Taylor testified that he received more complaints about Cotton and one other judicial commissioner, Andy Prendergast, than about any other judicial commissioners. Ricky Brown likewise testified that Cotton and Prendergast had more performance issues than the other judicial commissioners. Brown testified that Prendergast was the subject of "quite a few" complaints from law enforcement agencies. (Doc. No. 28-4, Brown Dep. 30, 65.) Prendergast, who is White, was removed from her position as judicial commissioner supervisor sometime before 2016, but she was reappointed as judicial commissioner in 2016 or 2017. She was not reappointed as judicial commissioner at the conclusion of her most recent term in January 2021. (*See* Doc. No. 28-2, Andre Dep. 54–56; Doc. No. 28-7, Prendergast Dep. 10.)

Andre testified that they received "so many complaints" about Cotton's being rude and unprofessional with law enforcement officers that she could not specifically remember when the complaints were made. (Doc. No. 28-2, Andre Dep. 105.) She could only remember the details of two complaints: (1) a written complaint from the Fairview Police Department; and (2) a verbal complaint from the Franklin Police Department.

The Fairview complaint stated that, when a Fairview police officer went to obtain a warrant when Cotton was on duty, Cotton told the officer he did not get paid overtime, so the officer would

have to wait fifteen minutes until the next judicial commissioner came on shift. (*Id.* at 106.) Cotton allegedly also stated, within the officer's hearing, "That's Fairview, They can just wait. The person that they've got in custody probably didn't do anything anyway." (*Id.* at 107.) Andre characterized this comment as inappropriate for a judicial commissioner. (*Id.*) Cotton denies knowledge of the judges' ever receiving a complaint from a Fairview officer and testified that he did not recall ever making that comment. (Doc. No. 28-1, Cotton Dep. 197.) This incident is documented in a June 30, 2020 email exchange between Fairview Police Officer David Martinez and Fairview Chief of Police Zach Humphreys and by the Affidavit of Zachary Beard, who attests that the complaint was brought to his attention by the General Sessions judges while he was acting as interim judicial commissioner during the summer of 2020. (Doc. No. 32-1, Beard Aff. ¶ 6; Doc. No. 32-1, at 5 (Ex. B to Beard Aff.).)

The other incident involved Franklin Police Officer Brink, who sought to obtain a warrant from Cotton but had difficulty during his testimony. Cotton described the incident as problematic because the officer was "missing pieces" of evidence, did not have "all of the facts," and had to keep going out and coming back in. (Doc. No. 28-1, Cotton Dep. 175.) Cotton advised the officer after his testimony that "this is poor police work." (*Id.*) Andre characterized Cotton's criticism of the officer as "uncalled for," "unprofessional" and "very demeaning," and her understanding was that it so upset the officer that he left before signing the warrant. (Doc. No. 28-2, Andre Dep. 107.) This incident was documented by a memorandum drafted by Ricky Brown, who was then the judicial commissioner supervisor, at or near the time of the incident and maintained in the "Judicial Commissioner Supervisor file" for Cotton in the ordinary course of business. (*See* Doc. No. 32-1, Beard Aff. ¶ 5; Doc. No. 32-1, at 4.)

In August 2020, Taylor and Andre met and agreed that Cotton should not be reappointed to another term as judicial commissioner after his term ended on September 3, 2020. Taylor testified that he had made up his mind in 2018, based on the Mezzatesta incident alone, that he would not vote to reappoint Cotton to another term as judicial commissioner. (Doc. No. 28-3, Taylor Dep. at 59.) Judge Andre cited as reasons for not re-appointing Cotton as judicial commissioner in 2020 his sleeping on the job, unprofessional manner with law enforcement, and the Mezzatesta incident. Regarding the latter, Andre testified that, although Cotton responded to the counseling by pointing out that others in the office engaged in pranks and "horseplay," in her mind "this was a situation where . . . a judicial commissioner has a disability and was injured, went to the hospital," and she was not aware of any situation in which "behavior by either one of the other commissioners caused someone to go to the hospital." (Doc. No. 28-2, Andre Dep. 111.) As set forth above, she was also troubled by Cotton's failure to express any remorse for the incident.

As of August 2020, because Cotton had worked for the County in other departments before becoming a judicial commissioner, he was approaching thirty years of service. About a week prior to the expiration of his term, the judges told Heithcock, who was judicial commissioner supervisor at the time, that Cotton would not be reappointed. Heithcock informed the judges that Cotton was only a few months away from reaching his thirty-year retirement date and asked the judges to consider whether there was a way to allow Cotton to remain employed through his thirty-year anniversary date. Andre and Taylor agreed to consider appointing Cotton to a temporary judicial commissioner position, rather than a full four-year appointment, to allow him to reach his thirty-year anniversary date.

Andre and Taylor met with Cotton on August 27, 2020 to tell him that he would not be appointed for a third four-year term as judicial commissioner. Cotton recalled that Judge Taylor

told him that he had never "been able to get over" the Mezzatesta incident and, for that reason among others, he would not be reappointed. (Doc. No. 28-1, Cotton Dep. 211.)

Although the plaintiff's second EEOC charge was filed in December 2019, it was not actually served on the County, and Andre and Taylor were not aware of it, until October 2, 2020. Thus, at the time the judges made their decision not to renew Cotton's appointment as judicial commissioner, and when they communicated that decision to Cotton, they had no notice of the second EEOC charge. As evidence of this delayed notice, the defendant points to Cotton's testimony, confirming that he filed the charge on December 6, 2019 but had no knowledge of when the County received notice of it. (Doc. No. 28-1, Cotton Dep. 188.) Cotton himself did not tell either of the judges that he had filed the charge, and he never received any kind of notice from the EEOC indicating that the County had responded to the second charge. (*Id.* at 189.) Andre affirmatively testified that she and Taylor had no knowledge of a second charge until after they had made the decision not to reappoint Cotton to a third term. (Doc. No. 28-2, Andre Dep. 83.) Taylor likewise testified that he found out about it in October 2020. (Doc. No. 28-3, Taylor Dep. 38.) The EEOC's Activity Log for Charge No. 494-2020-00570C reflects that a Notice of Charge was emailed to RogersA@williamson-tn.org on December 10, 2019; that the "email bounced" with the notice "Returned Subject: Undelivered Mail Returned to Sender." (Doc. No. 24-10, at 7.) The next reference in the EEOC Activity Log to any attempt to notify the "respondent" of the charge reflects that the Notice of Charge was resent on October 2, 2020 to Mike.weber@williamsoncounty-tn.gov, "Reason: Updated R contact info." (*Id.* at 6.) The log further reflects that, within an hour of the resending of the notice, the "respondent" logged into the EEOC's system to access and download the charge for the first time. (*Id.*) On October 5, 2020, the EEOC uploaded a letter of representation from the respondent's attorney. (*Id.*) That letter, directed

to Melissa Brown of the EEOC's Nashville Area Office, states that, although the charge appeared to have been filed in December 2019, "Williamson County did not receive a Notice of Charge and did not receive any request for information prior to October 2, 2020," the date that Williamson County's Human Resources Director, Mike Weber, received notice of Cotton's Charge of Discrimination. (*Id.* at 9.) The attorney's letter also requested an extension of time on behalf of the County to respond to the charge, in light of the delayed notice. (*Id.*)

The plaintiff purports to dispute the assertion that the County did not receive notice of his December 6, 2019 EEOC charge until October 2, 2020, but he references only the fact that the "EEOC sent a Notice of Charge to the Williamson County Mayor Rogers Anderson on December 10, 2019." (Doc. No. 27, Pl.'s Resp. to Statement of Undisp. Material Facts ("Resp. SUMF") ¶ 55 (citing Notice of Charge, Doc. No. 28-13).) This copy of the Notice of Charge, however, reflects only that it was directed to Rogers Anderson, Williamson County Mayor, at RogersA@williamson-tn.org, and available for upload through the EEOC's Digital Charge System. (*See* Doc. No. 28-13.)

Williamson County's Reply is accompanied by the Affidavit of David Thomas, Williamson County's Information Technology Director, who explains that, in 2018, the County changed domain addresses for its officials' and employees' email addresses from "williamson-tn.org" to "williamsoncounty-tn.gov," as a result of which the email address for Mayor Rogers Anderson changed from RogersA@williamson-tn.org to RogersA@williamsoncounty-tn.org. (Doc. No. 32-2, Thomas Aff. ¶¶ 1–2.) Thomas also avers that an email sent to the former address would not have been forwarded to the new address, nor would the mayor have received notice that an email was sent to the defunct address. (*Id.* ¶ 3.)

In any event, at the same meeting during which the judges told Cotton he would not be reappointed for another four-year term, the judges sought to determine whether they could reach an agreement with Cotton about a temporary appointment to allow him to reach thirty years of service. They offered him a temporary appointment that would allow him to do so, in exchange for Cotton's agreeing to sign a release of any possible claims against Williamson County, including any claims of employment discrimination or retaliation.[4] Cotton did not agree to sign a release of claims, so he did not receive a temporary appointment, and his term as judicial commissioner expired on September 3, 2020. The plaintiff understood that he was appointed to four-year terms and that he did not have an automatic right to be reappointed every four years.

Cotton accepted a kitchen staff position with the Williamson County Sheriff's Office to bridge the time until his thirty-year anniversary. He voluntarily resigned from that position on July 5, 2021, four months after reaching his thirty-year anniversary. (*See* Doc. No. 28-1, Cotton Dep. 250–52 (confirming that he was eligible to retire with thirty years of service on March 5, 2021 but continued working until July 5, 2021 to get certain longevity benefits that accrued every July and agreeing that, as far as he knew, the sheriff would have allowed him to continue working for the County if he had wanted to).)

Following the expiration of Cotton's term as judicial commissioner, James McMillen (White) was appointed as judicial commissioner on March 8, 2021, and Mary Alexander (Black) was appointed on November 1, 2021.

---

[4] Although both refer to it, neither party filed a copy of the proposed agreement. They agree that it stated that Cotton "could file a charge with the EEOC but could not recover any monetary award stemming from such charge." (Doc. No. 31, Def.'s Resp. to Pl.'s Statement of Additional Facts ¶ 35.)

On December 3, 2020, Cotton filed a third EEOC charge alleging that he was subjected to race discrimination and retaliation when the judges declined to reappoint him for a third term in September 2020. In this charge, he alleges that he was not reappointed and was terminated effective September 3, 2020 because of his refusal to sign a waiver and release of his claims of discrimination and retaliation. The third EEOC charge does not contain any reference to the failure to appoint Cotton as interim judicial commissioner supervisor in June 2020, when Beard was appointed instead of him.

Cotton received a right-to-sue letter related to his second EEOC charge on June 14, 2022. He has now established that he received a right-to-sue letter in connection with his third EEOC charge on June 24, 2022.

The plaintiff filed this lawsuit on September 13, 2021, asserting claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (Counts I and II) and race discrimination, retaliation, and a hostile work environment in violation of the Tennessee Human Rights Act ("THRA") (Counts III and IV), based on (1) the defendant's failure to promote him to a supervisory position in 2017; (2) his being written up for the "prank" involving his colleague Mezzatesta in August 2018; (3) the defendant's failure to promote him to a supervisory position in February 2019; (4) being passed over for a promotion again in the summer of 2020; (5) his termination as a Judicial Magistrate on September 3, 2020; and (6) the defendant's refusal to extend his appointment by several months (until he reached thirty years of service) unless he agreed to waive any possible claims against the County. (*See generally* Doc. No. 1.)[5]

---

[5] Although the Complaint alleges that the plaintiff was constructively discharged on March 5, 2021 (Doc. No. 1 ¶ 39), the record establishes that the plaintiff continued to work for the County after March 5 and voluntarily resigned four months later. (Doc. No. 28-1, Cotton Dep. 250–52.) It does not appear that the plaintiff continues to maintain that he suffered a constructive discharge.

The defendant has now moved for summary judgment on all of the plaintiff's claims, and has filed a Memorandum of Law in support of its motion (Doc. No. 22), a Statement of Undisputed Material Facts (Doc. No. 23), and evidentiary material to back up its version of the facts (Doc. Nos. 24-1 through 24-10). The plaintiff has filed a Response in opposition to the motion (Doc. No. 26), Response to the Statement of Undisputed Material Facts and Additional Statement of Facts (Doc. No. 27), and his own evidentiary material (Doc. Nos. 28-1 through 28-17). The defendant filed a Reply (Doc. No. 30) along with a Response to the Statement of Additional Facts (Doc. No. 31), supported by additional Affidavits (Doc. Nos. 32-1, 32-2).

## II.    STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—

that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

In its Reply, the County argues that the plaintiff's failure to respond to certain of its arguments amounts to a waiver of the claims to which the defendant's arguments are addressed. (Doc. No. 30, at 1.) Indeed, the Sixth Circuit has repeatedly stated that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24–25 (6th Cir. 2003)). At the same time, however, in *reported* opinions, the Sixth Circuit has made it clear that a district court faced with a plaintiff's failure to respond, in whole or in part, to a motion for summary judgment "[may] not use that [failure] as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c)." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) (quoting *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979)). The district court retains this obligation, because "[a] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (quoting *Smith*, 600 F.2d at 64).

Consequently, despite the plaintiff's silence in response to some of the defendant's arguments, the court "must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists" before granting summary judgment on the grounds asserted. *Id.*

## III. DISCUSSION

The County argues that it is entitled to summary judgment on Cotton's THRA claims, as they are wholly barred by the applicable one-year statute of limitations. It also argues that it is entitled to judgment on the plaintiff's Title VII claims as a matter of law, because (1) Cotton was an appointee at the policy making level and, as such, exempt from the protections of Title VII; (2) any claim that was the subject of Cotton's first EEOC charge, with respect to which a right-to-sue letter was issued on August 6, 2019, must be dismissed as untimely; (3) any claim premised upon the failure to promote that took place on February 8, 2019 must be dismissed as time-barred, because the EEOC charge was not filed within the statutorily allotted time frame; (4) any claim premised upon the County's appointment of Zachary Beard as interim supervisor in June 2020 is subject to dismissal for failure to exhaust;[6] and (5) the plaintiff has no direct evidence of race discrimination or retaliation, and he cannot establish a *prima facie* case of his claims analyzed under the *McDonnell Douglas* framework applicable to claims based on circumstantial evidence.

### A. THRA Claims

The plaintiff has not responded to the defendant's argument that the THRA claims are time-barred, but the court must still examine the record in light of the governing law to determine

---

[6] The defendant also initially argued that the plaintiff failed to exhaust his administrative remedies in connection with any claims alleged in his third EEOC charge, because he had not shown that he had received a right-to-sue letter in connection with that charge. The defendant has subsequently conceded that the plaintiff has cured that failure, having belatedly received his right-to-sue letter.

whether the defendant has established that it is entitled to judgment as a matter of law as to these claims.

THRA claims are subject to a one-year limitations period beginning when the alleged discriminatory and/or retaliatory activity ceases. *See* Tenn. Code Ann. § 4-21-311(d) ("A civil cause of action under this section shall be filed in chancery court or circuit court within one (1) year after the alleged discriminatory practice ceases . . . ."). Unlike for Title VII actions, the filing of an EEOC charge does not toll the statute of limitations on THRA claims. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). In *Weber v. Moses*, 938 S.W.2d 387 (Tenn. 1996), the Tennessee Supreme Court affirmed the dismissal of the plaintiff's THRA claim as time-barred, based on the finding that the statute of limitations began to run on the date the plaintiff received oral notification that his sales manager contract would terminate, rather than three weeks later, on the effective date of the termination, or the day after the termination, when the plaintiff received written notification of termination in accordance with his contract. The court's decision was based on its conclusion that the employer's *decision* to terminate the plaintiff's sales manager contract for discriminatory reasons was the discriminatory practice prohibited by the THRA and that the plaintiff had notice of that wrongful action, for purposes of the commencement of the limitations period, when he received oral notification of the decision. *Id.* Citing (among other cases) *Chardon v. Fernandez*, 454 U.S. 6 (1981), and *Delaware State College v. Ricks*, 449 U.S. 250 (1980), the Tennessee court held unequivocally that "a discriminatory termination ceases and is complete . . . when the plaintiff is given unequivocal notice of the employer's termination decision, even if employment does not cease until a designated date in the future." *Id.* at 391–92. The court also noted that the "existence of a grievance procedure does not change the principle that the statute of limitations begins to run when the termination decision is made." *Id.* at 392 (citations omitted).

In this case, as set forth above, it is undisputed for purposes of the Motion for Summary Judgment that Judges Taylor and Andre met sometime in August 2020 and agreed that Cotton would not be reappointed to another term as judicial commissioner when his term expired on September 3, 2020. On August 27, 2020, the judges met with the plaintiff and told him that he would not be reappointed to a third term. At the same meeting, the judges offered Cotton a temporary appointment that would have allowed him to continue working until he reached the anniversary of his thirty years of service with the County, in exchange for his agreeing to sign a release of any possible claims against the County. The plaintiff declined the offer, and his term as judicial commissioner expired on September 3, 2020. Although the plaintiff then took a kitchen staff position with the Williamson County Sheriff's Office, from which he voluntarily resigned on July 5, 2021, the Complaint does not raise any claims about Cotton's employment with the Williamson County Sheriff's Office, and he filed this lawsuit on September 13, 2021—more than one year after being notified that he would not be reappointed to a third term as judicial commissioner and more than one year after his appointment as judicial commissioner terminated. (*See* Doc. No. 1.)

It is clear, as set forth above, that the statute of limitations began to run on August 27, 2020, when the plaintiff received notice of his non-reappointment. However, even if the limitations period is deemed to begin running on September 3, 2020, when Cotton's term as judicial commissioner actually expired, this lawsuit was not filed until September 13, 2021, more than a year after either of those dates. Because filing an EEOC complaint did not toll the running of the statute of limitations, the plaintiff's THRA claims are barred by the one-year statute of limitations. The defendant is entitled to summary judgment on all of the plaintiff's THRA claims.

### B.    Title VII Claims

#### 1.    *Cotton Was an Appointee at the Policy Making Level*

Under Title VII, it unlawful for an employer "to fail or refuse to hire or to discharge any *individual*, or otherwise to discriminate against any *individual*" because of race. 42 U.S.C. § 2000e–2(a)(1) (emphasis added). Although the statute refers to "individual[s]," courts, including the Sixth Circuit, have limited Title VII's protections to individuals who also qualify as "employees" under Title VII. *Birch v. Cuyahoga Cty. Prob. Court*, 392 F.3d 151, 157 (6th Cir. 2004) (citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1242 (11th Cir. 1998)). An "employee" is

> an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

42 U.S.C. § 2000e(f). This provision creates three separate categories of exclusion for those hired by an elected state "officer": (1) members of the officer's personal staff; (2) appointees at the policy making level; and (3) immediate advisers to the officer concerning the "exercise of the constitutional or legal powers of the office." *Id.*; *see Curl v. Reavis*, 740 F.2d 1323, 1328 (4th Cir. 1984) (recognizing these categories as distinct). In addition, however, this exception does not apply to "employees subject to the civil service laws of a State government, governmental agency or political subdivision." *Id.*

The County argues that Cotton was not an "employee" for Title VII purposes and, therefore, that he cannot sue under that statute. It argues that he was exempt because he was an "appointee on the policy making level." The plaintiff contests that proposition. Neither party actually addresses the question of whether Cotton, as a judicial commissioner, was subject to state

or county civil service laws. It appears that they simply presume that, as judicial commissioner, the plaintiff was *not* subject to civil service laws.

The court finds that presumption reasonable, given that judicial commissioners are appointed for a specific term by, and at the pleasure of, the County's General Sessions judges, Tenn. Code Ann. §§ 40-5-202, -204, and may not be removed from their position mid-term except through formal ouster proceedings, governed by Tenn. Code Ann. §§ 8-47-101 *et seq. See* Tenn. Op. Atty. Gen. No. 00-126 (Aug. 7, 2000). In addition, the Tennessee civil service laws, more generally, do not apply to the "judicial branch of state government." Tenn. Code Ann. § 8-30-102(b)(2). *See Moore-Pennoyer v. State*, 515 S.W.3d 271, 277 (Tenn. 2017) ("Although [the Tennessee Excellence, Accountability, and Management Act of 2012—an act that replaced the civil service laws—]generally applies 'to all personnel in state service,' Tenn. Code Ann. § 8-30-102(a) (2016), it does not apply to 'the judicial branch of state government including, but not limited to, employees of the administrative office of the courts . . . .' *Id.* § 8-30-102(b)."). The judicial commissioners, appointed by General Sessions judges to perform functions that otherwise fall within the scope of General Sessions judges' authority and under the general supervision of the General Sessions judges, appear to be an integral part of the "judicial branch" of state government. *Accord* Tenn. Op. Atty. Gen. No. 00-126 (Aug. 7, 2000) ("[A] judge has inherent authority to exercise supervisory authority over judicial commissioners who perform functions for that court where such supervision is reasonably necessary to maintain order within that judge's court and to promote the administration of justice."). The court concludes, as a matter of law, that judicial commissioners are not subject to civil service laws.

The more difficult question is whether Cotton, as judicial commissioner, was an "appointee on the policy making level," as contemplated by 42 U.S.C. § 2000e(f). This exception is to be

construed narrowly. *Battle v. Haywood Cty. Bd. of Educ.*, No. 10-1024, 2011 WL 4833113, at *16 (W.D. Tenn. Oct. 12, 2011) (citing *Butler v. N.Y. Dep't of Law*, 211 F.3d 739, 747 (2d Cir. 2000)), *aff'd*, 488 F. App'x 981 (6th Cir. 2012). Although Title VII does not define "appointee on the policy making level," the legislative history reflects that the exception was intended to exempt "persons appointed by . . . elected officials . . . to policymaking positions at the highest levels of the departments or agencies." *Butler*, 211 F.3d at 747.

The Sixth Circuit has discussed this exemption in the context of a Title VII complaint brought by a "magistrate in the Release of Assets Department of the Cuyahoga County Court of Common Pleas Probate Court" in Ohio. *Birch*, 392 F.3d at 155. The defendant in that case argued that the plaintiff was exempt, either because she "serve[d] on the personal staff" of the Presiding Judge of the Probate Court, an elected official, or because she was an "appointee on the policy making level." *Id.* at 158. The Sixth Circuit found that either or both exceptions applied. Specifically regarding whether the plaintiff qualified as an appointee at the policy making level, the court cited and approved the district court's opinion in *Dyer v. Radcliffe*, 169 F. Supp. 2d 770, 774 (S.D. Ohio 2001), which held that a referee/magistrate serving the Juvenile Division of the Ohio Court of Common Pleas was a policy-making appointee and therefore "not an employee under Title VII," as follows:

> Under Ohio law, "the juvenile judge may appoint . . . referees . . . ." O.R.C. § 2151.16. The Sixth Circuit has determined that "the referee effectively makes policy for, or suggests policy to the court on each occasion that he resolves a dispute in the court's name or recommends a disposition to the judge." *Mumford v. Basinski*, 105 F.3d 264, 272 (6th Cir. 1997).

*Birch*, 392 F.3d at 159–60 (quoting *Dyer*, 169 F. Supp. 2d at 774–75). In *Birch*, the Sixth Circuit found that the probate judge in the case before it, like the juvenile judge in *Dyer*, had "the authority to appoint magistrates like Birch" and, further, that it had already held in *Mumford* that "the inherent duties of a magistrate in the service of an Ohio Domestic Relations Court involve

policymaking." *Id.* at 160. Because the duties of a probate court magistrate and a juvenile court referee were delineated by the same Ohio Rules of Civil Procedure, the court in *Birch* found that it was compelled by *Mumford* to conclude that the magistrate before it was a political appointee and not an employee under Title VII. *Id.*

In reaching the conclusion in *Mumford* that a magistrate was a political appointee under Ohio law,[7] the court noted that the Ohio Rules of Civil Procedure authorize the appointment of referees "to hear an issue or issues in any case in which the parties are not entitled to a trial by jury or in any case in which the parties consent in writing or in the record in open court, to submit an issue or issues to a court-appointed referee." *Mumford*, 105 F.3d at 272 (citations omitted). Consequently, a referee "is an agent and officer of the appointing court and is clothed with the powers and duties of the judicial office which [sic] appoints him." *Id.* (citation omitted). Such duties include, among others,

> the conduct of hearings on the matters referred to him, the issuance of subpoenas, the swearing and examination of witnesses, and (unless otherwise specified in the order of reference) the promulgation of evidentiary rulings and the entry of certain pretrial, discovery, temporary restraining, and other orders necessary to regulate the proceedings, all without judicial ratification. However, the referee's decisions otherwise are mere recommendations which become effective only upon adoption by the court.

*Id.* (citing Ohio R. Civ. P. 53). Based on this delegation of duties, the court found that an Ohio state court referee, by discharging his "inherent duties," "effectively makes policy for, or suggests policy to, the court on each occasion that he resolves a dispute in the court's name or recommends a disposition to a judge." *Id.*

---

[7] *Mumford* involved a claim under 42 U.S.C. § 1983 by a former referee for the Domestic Relations Division of a Court of Common Pleas, who alleged that he had been terminated based on his political affiliation in violation of his rights under the First Amendment.

In light of the Sixth Circuit's holdings in both *Birch* and *Mumford*, the court finds that judicial commissioners under Tennessee law are likewise policy-making appointees. First, it is undisputed for purposes of summary judgment that, at all relevant times, judicial commissioners in Williamson County were appointed by the two elected General Sessions Court judges for a four-year term and were authorized to perform a variety of functions that involved the exercise of independent judgment, including making probable cause determinations in response to warrant applications; issuing arrest and search warrants, juvenile petitions, and criminal summonses; and setting bond. *See also* Tenn. Code Ann. § 40-1-111. These duties also fall within the scope of the General Sessions judges' authority and, but for being delegated by them to the judicial commissioners, would require resolution by a judge. *See* Tenn. Code Ann. § 40-1-110 (authorizing judges of the general sessions courts to "issue any and all process" in connection with criminal cases disposed of by them). Second, by statute, judicial commissioners serve "at the pleasure" of the judges who appoint them, even though they are appointed for specific terms, Tenn. Code Ann. §§ 40-5-202, -204, and cannot be removed from office in the middle of a term except in accordance with the statutory procedure for ouster, which applies to "[e]very person holding any office of trust or profit" under law and requires such grounds as willful "misconduct in office," the knowing or willful neglect of duty, public intoxication, illegal gambling, or any other "act constituting a violation of any penal statute involving moral turpitude." Tenn. Code Ann. § 8-47-101. The General Sessions judges have the authority to counsel judicial commissioners and to provide guidance, and decisions made by a judicial commissioner are subject to review only the appointing judges.

The court finds, based on the record now before it, that a judicial commissioner for the Williamson County General Sessions Court is an "appointee on the policy making level" and

therefore exempt from the protections of Title VII. 42 U.S.C. § 2000e(f). For this reason alone, the defendant is entitled to summary judgment on all of the plaintiff's Title VII claims. However, the court also finds, as discussed below, that the claims are subject to dismissal on other grounds as well.

### 2. Some Title VII Claims Are Time-Barred

The defendant argues that any claims that were the subject of Cotton's first EEOC charge and any claims premised upon the failure to promote that took place on February 8, 2019 must be dismissed as untimely. The plaintiff has not responded to either of these arguments, and the court finds, as set forth below, that the defendant has carried its burden of showing that these claims are time-barred.

### a) First EEOC Charge

As set forth above, Ricky Brown, a White man, was selected to replace Quentin Henderson (presumably also White) as Supervisor of the Magistrate Office in August 2017. On April 23, 2018, Cotton filed his first EEOC charge, alleging discrimination on the basis of race/color, based on his having been denied the opportunity to apply for, and being passed over for, a promotion to the Supervisor position. The EEOC issued a right-to-sue letter without making a finding of discrimination on August 6, 2019. The plaintiff filed this lawsuit on September 13, 2021, more than two years later.

If an individual wants to pursue a Title VII claim in federal court, the complaint asserting such a claim must be filed within ninety days of the claimant's receiving notice of the EEOC's dismissal of his charges and notice of his right to sue. 42 U.S.C. § 2000e-5(f)(1). Although this deadline is not jurisdictional, "it is a mandatory claims-processing rule that must be enforced if properly raised by the employer." *Robinette v. ProMedica Pathology Labs., LLC*, No. 21-3867, 2022 WL 4540192, at *2 (6th Cir. May 9, 2022) (citing *Truitt v. Cty. of Wayne*, 148 F.3d 644, 646

(6th Cir. 1998); *Kilpatrick v. HCA Human Res., LLC*, 838 F. App'x 142, 146 (6th Cir. 2020)) (affirming dismissal of *pro se* complaint mailed before the ninety-day deadline but not received by the court clerk and filed until five days after it expired).

The defendant has properly raised the issue here, both in its Answer and in the present motion. The record establishes that the plaintiff did not file a lawsuit based on the 2018 failure to promote within ninety days of his receipt of the right-to-sue notice in August 2019, nor does he assert any basis for equitable tolling. *See Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000) (recognizing that the limitations period for filing an EEOC complaint after the plaintiff's receipt of a right-to-sue notice may be equitably tolled but that the "federal courts sparingly bestow equitable tolling"). In fact, the plaintiff does not even respond to the defendant's argument that any Title VII claim based on the 2018 failure to promote is time-barred. Moreover, the law is clear that "[d]iscrete acts such as termination [and] failure to promote" each "constitute[] a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). A plaintiff "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.* The court finds, therefore, that any claim based on the August 2017 failure to promote and on the associated EEOC charge filed in 2018 is barred by the statute of limitations. The defendant is entitled to summary judgment on any such claim.

### b) Claims Based on February 8, 2019 Failure to Promote

The plaintiff admits that, on February 8, 2019, Ricky Brown resigned from his position as judicial commissioner supervisor, and Judges Andre and Taylor selected Tommy Heithcock to replace him. (*See* Doc. No. 27, Resp. SUMF ¶ 50.) The plaintiff learned that Brown was going to leave when Heithcock told him that he had already been selected to take Brown's place. Although the plaintiff could not remember when exactly this occurred, his testimony indicates that it was

not later than the date Heithcock actually became supervisor. (*See* Doc. No. 28-1, Cotton Dep. 182 ("I just got a – either an email or a text message from Tommy [Heithcock] telling me that Ricky [Brown] was leaving, and he [Heithcock] had been given the position.").) Cotton filed a second EEOC charge alleging race discrimination and retaliation, premised upon the selection of Heithcock as supervisor, on December 6, 2019—301 days after Brown resigned and Heithcock succeeded him as supervisor.

The filing of a timely discrimination charge with the EEOC is not a jurisdictional requirement but, like the ninety-day limitations period discussed above, it is a mandatory claim-processing rule that "a court must enforce . . . if a party properly raises it." *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849 (2019) (internal quotation marks, brackets, and citation omitted); *see also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."). The applicable statute of limitations begins to run from the date of "the alleged unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1). In a "deferral" state like Tennessee, the discrimination charge must be filed within three hundred days after the alleged unlawful employment practice occurred. *Amini v. Oberlin Coll.*, 259 F.3d 493, 499 (6th Cir. 2001) (quoting 42 U.S .C. § 2000e–5(e)(1)). "[T]he limitations period does not begin to run on a claim for employment discrimination until an employer makes and communicates a final decision to the employee. Once the employee is aware or reasonably should be aware of the employer's decision, the limitations period commences." *Id.* (citations omitted).

In this case it is undisputed that the employment decision that was the subject of the plaintiff's second EEOC charge—the promotion of Heithcock upon Brown's resignation—was

communicated to the plaintiff sometime shortly before Brown retired and before Heithcock actually assumed the supervisory position on February 8, 2019. The statute of limitations would have begun to run on the date of that communication. The plaintiff does not remember when that occurred, but it is clear in any event that the limitations period began to run no later than February 8, 2019, the day Heithcock assumed Brown's position. The limitations period expired, at the latest, three hundred days later, on December 5, 2019. The plaintiff's EEOC charge was signed and filed on December 6, 2019 (a Friday), one day late. (Doc. No. 24-10, at 8.) The plaintiff does not allege any basis for equitable tolling and, indeed, has not responded to the argument that the claim based on the failure to promote that took place in February 2019 is time-barred, other than to assert that he filed his present lawsuit within ninety days of receiving his right-to-sue letter for his second EEOC charge.

The court notes that this case is distinguishable from, for example, *Grooms v. Walden Security*, No. 3:21-cv-00363, 2022 WL 949842 (M.D. Tenn. Mar. 29, 2022) (Richardson, J.). The defendant there argued that the plaintiff's filing of an EEOC charge was untimely, having been filed on the 301st day following her termination. The court denied the defendant's Rule 12(b)(6) motion to dismiss on statute of limitations grounds, finding that the allegations in the complaint established that, on the 300th day following her termination, the plaintiff had contacted the EEOC by fax to notify it that she wished to file a charge of discrimination; the EEOC responded the same day by email requesting that the plaintiff provide certain information; and the plaintiff spoke on the phone with an EEOC representative and provided a statement of the facts and circumstances supporting her charge, which the EEOC representative recorded, in writing, on the EEOC's standard Charge Form, Form 5, and assigned a Charge number. *Id.* at *2. The next day, the 301st day following the plaintiff's discharge, the EEOC representative returned the completed Charge

form to the plaintiff with instructions that she sign and return it. The EEOC representative also mailed a Notice of Charge of Discrimination to the defendant on that day. *Id.* Based on these factual allegations, the court found that, although the plaintiff had not verified the Charge on the 300th day, a written charge containing all of the otherwise necessary information—the identity, phone number, and address of the plaintiff and defendant and a brief statement summarizing the discrimination claim of discrimination—had been prepared on that day. That is, the charge

> contain[ed] information that is sufficiently precise to identify the parties, and to describe generally the action or practices complained of. Additionally, because the Charge of Discrimination was indeed completed (except insofar as it was not just verified) by May 12, on that date an objective observer [obviously would] believe that the filing taken as a whole suggests that the employee requests the agency to activate its machinery and remedial processes. And the Charge of Discrimination indeed did activate the remedial process, as the very next day the EEOC sent notice to Defendant of a charge of discrimination levied against them by Plaintiff.

*Id.* at *6 (internal quotation marks and citations omitted). The court noted that, even though the written charge was not verified within the limitations period, "the Supreme Court . . . has explained that an unverified writing that is filed within the statutory time limit and otherwise meets the requirements of a charge must be considered a sufficient charge if it is supplemented by a subsequent verification (even if that verification occurs after the filing period)." *Id.* at *7 (citing *Edelman v. Lynchburg Coll.*, 535 U.S. 106, 112–13 (2002)).

In this case, in response to the defendant's evidence that the Charge was created, assigned a charge number, signed, and filed on December 6, 2019 (the 301st day following the failure to promote), the plaintiff has not presented or pointed to any countervailing evidence from which the court could find that there is at least a material factual dispute as to whether the plaintiff took any steps within the limitations period—by or before December 5, 2019—that in the aggregate could constitute the "filing" of a "charge" under the Sixth Circuit's definition thereof. *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 508 (2011) (noting that the Supreme Court had distinguished

between a mere request for information and an "enforcement request" and holding that, for a "filing" to be deemed a "charge," it "(1) must be 'verified' . . . ; (2) must contain information that is 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of' . . . ; and (3) must [suggest to any] 'objective observer' that . . . the employee 'requests the agency to activate its machinery and remedial processes'" (quoting *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 398, 402 (2008); 29 C.F.R. §§ 1601.3(a), 1601.12(b)).

The defendant is entitled to summary judgment on any discrimination or retaliation claim based on the February 2019 failure to promote.

### 3. Failure to Exhaust

The County argued initially that the plaintiff could not pursue any claim in his third EEOC charge because he had not yet received notice of his right to sue. (Doc. No. 22, at 9–10.) The County has now abandoned that argument, in recognition of the plaintiff's belated receipt of a right-to-sue notice in connection with this third EEOC charge, on June 24, 2022.

The defendant, however, also maintains that, because the plaintiff "did not assert any claim in his third EEOC charge (or any other EEOC charge of which Defendant is aware) related to the placement of Beard into the interim supervisor role in Summer 2020, . . . [a]ny such claim is . . . subject to dismissal for failure to exhaust administrative remedies." (*Id.* at 9 n.6 (record citations omitted); *see also id.* at 16 n.12 ("The placement of Beard in Summer 2020 as interim supervisor was not included in Plaintiff's third EEOC charge (or any other EEOC charge) and is subject to dismissal for failure to exhaust administrative remedies.").)

Exhaustion, while not jurisdictional, is a mandatory prerequisite under Title VII that, like the various filing deadlines discussed above, is strictly enforced if properly raised by the defendant. *Kilpatrick v. HCA Hum. Res., LLC*, 838 F. App'x 142, 145–46 (6th Cir. 2020) (citing *George v. Youngstown State Univ.*, 966 F.3d 446, 469 (6th Cir. 2020)); see also *Davis*, 139 S. Ct. at 1846.

As set forth above, an employee alleging employment discrimination in violation of the statute must first file an administrative charge with the EEOC within a certain time after the alleged wrongful act or acts, 42 U.S.C. § 2000e–5(e)(1), and a Title VII plaintiff generally "cannot bring claims in a lawsuit that were not included in his EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) (citing 42 U.S.C. § 2000e–5(f)(1); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47 (1974)). This rule is to be construed liberally, however, "so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id.* at 362. "As a result, 'whe[n] facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim.'" *Id.* (quoting *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998)).

In his Response to the defendant's Statement of Undisputed Material Facts, as set forth above, Cotton expressly concedes that his third EEOC charge does not include any claim related to the promotion of Zach Beard to interim supervisor. (*See* Doc. No. 27, Resp. SUMF ¶ 105; Cotton Dep. 231–32; Doc. No. 24-3, at 124, Dec. 3, 2020 EEOC Charge No. 494-2021-00580.) Instead, the charge alleges that he was not reappointed to his position as judicial commissioner effective September 3, 2020 because of his refusal to "dismiss [his] EEOC Charge and sign a Waiver and Release of all claims against the County." (*Id.* ¶ 104; Doc. No. 24-3, at 124.) The December 3, 2020 EEOC Charge further states that Cotton "wish[ed] to amend" his previous EEOC charge (presumably the charge filed on December 6, 2019) "to add claims of retaliatory termination." (Doc. No. 24-3, at 124.) He does not respond to the exhaustion argument other than to assert, in a wholly conclusory fashion, that he "properly exhausted his administrative remedies under Title VII prior to filing the present lawsuit" by "filing his third Charge with the EEOC within 300 days

of his non-reappointment" and that he received his right-to-sue letter from the Department of Justice on June 24, 2022.

On its face, the plaintiff's EEOC charge contains no facts remotely referencing the defendant's failure to promote him to the interim judicial commissioner supervisor position in June 2020. A claim based on the failure to promote is not reasonably related to, nor could it be expected to grow out of, the factual allegations in the EEOC charge relating to the non-renewal of the plaintiff's appointment as judicial commissioner. The charge refers only to Cotton's termination and asserts that it was in retaliation for Cotton's refusal to sign the proposed waiver and release of claims. The defendant properly raised and preserved this issue. Consequently, the court finds that the defendant is entitled to summary judgment on any putative claim of discrimination or retaliation premised upon the June 2020 failure to promote.

4.    *The Merits of the Plaintiff's Remaining Title VII Discrimination Claim*

As set forth above, the plaintiff's Title VII discrimination claims are based on several discrete adverse employment actions, including the failures to promote in August 2017, February 2019, and in June 2020, as well as on the decision not to renew his appointment as judicial commissioner that took effect on September 3, 2020. As already discussed, however, the claims based on the August 2017 and February 2019 failures to promote are time-barred, and the plaintiff did not administratively exhaust his discrimination claim based on the June 2020 failure to promote, effectively leaving for consideration on the merits only the plaintiff's discrimination claim based on the decision not to renew his appointment as judicial commissioner, which occurred in August 2020 and resulted in the expiration of his appointment on September 3, 2020. In his Response to the Motion for Summary Judgment, in fact, the only adverse employment action that the plaintiff addresses as discriminatory is the non-renewal of his appointment as judicial commissioner. The court finds, as set forth below, that this claim fails on the merits.

a)      Title VII Standards

Title VII discrimination claims may be supported by direct or circumstantial evidence. *Jenkins v. Regents of the Univ. of Mich. Health Sys.*, 763 F. App'x 545, 550 (6th Cir. 2019). For purposes of the defendant's motion, the plaintiff does not purport to have any direct evidence of race discrimination.[8]

Title VII provides that an employer may not "discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Where, as here, the plaintiff relies on circumstantial evidence to prove his discrimination claim, courts analyze the claim under the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which first requires the plaintiff to make out a *prima facie* case of discrimination. To do so, the plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position;

---

[8] The parties devote a substantial amount of page space to addressing the plaintiff's allegation that two individuals told him about an accidentally recorded telephone call between Judge Andre and another judicial commissioner that took place in 2012, prior to Cotton's initial appointment (by Judge Andre and Judge Nations), during which Judge Andre purportedly used the "n word." (Doc. No. 28-1, Cotton Dep. 61–65.) Cotton has never heard that recording (*id.* at 63), and Judge Andre denies ever using that word (Doc. No. 28-2, Andre Dep. 46). Fatima Robertson, one of the two individuals who overheard the recording, remembers hearing the racial slur but does not believe that Judge Andre made it or that she was even party to the telephone conversation. (Doc. No. 24-8, Robertson Aff. ¶¶ 4–6.) The other individual, Mary Prendergast, recalled that Andre was a party to the conversation, but Prendergast could not recall for sure who made the racial slur. (Doc. No. 28-7, Prendergast Dep. 22–24.) The court finds that the plaintiff's assertion that Andre made this racial slur is triple hearsay unsubstantiated by Andre or either of the people who allegedly heard the recording and told the plaintiff about it. As such, it does not qualify as "direct" evidence of discrimination or, indeed, evidence at all, as it is not in a form that could possibly be admitted into evidence at a trial. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). In any event, the plaintiff does not contend that he is in possession of direct evidence of discrimination.

and (4) he was replaced by someone outside his protected class, or similarly situated non-protected employees were treated more favorably than he was. *Stewart v. Esper*, 815 F. App'x 8, 16 (6th Cir. 2020) (citing *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016)).

An adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." *Id.* (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)) (ellipsis in original). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Generally, an action may qualify as a materially adverse employment action if, viewed objectively, it was "objectively intolerable to a reasonable person." *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002).

Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (internal quotation marks and citations omitted). To make the requisite showing, the plaintiff must present sufficient evidence that a jury could find both that the defendant's reasons were not its true reasons and that they were, instead, a pretext for discrimination. *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 661 (6th Cir. 2020).

b)      Discussion

As an initial matter, the defendant's arguments to the contrary notwithstanding, the court finds that the plaintiff has established a *prima facie* case of discrimination. There is no dispute that

(1) as an African American, Cotton is a member of a protected class; (2) he was subjected to an adverse employment action when his appointment as judicial commissioner was not renewed—a decision that resulted in a "significant change in benefits," *Ellerth*, 524 U.S. at 761; (3) he was qualified for the position; and (4) he was replaced by a White man, albeit approximately six months later, when the judges appointed James McMillen as judicial commissioner.

The defendant, however, has proffered ample non-discriminatory reasons for the nonrenewal, including the Mezzatesta incident, repeated reports that the plaintiff was sleeping while on the job, and the receipt of frequent complaints by law enforcement officers about the plaintiff. (Doc. No. 28-2, Andre Dep. 101–11.) Taylor, in particular, testified that his decision not to reappoint the plaintiff was due to the Mezzatesta incident. (Taylor Dep. 58–59.)

The burden, therefore, shifts to the plaintiff to show that the proffered reasons are "actually a pretext to hide unlawful discrimination." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (quoting *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 777 (6th Cir. 2018)). "At the summary judgment stage, a plaintiff meets this burden when he 'produce[s] evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason.'" *Id.* (quoting *Rogers*, 897 F.3d at 777). "Plaintiffs ordinarily show pretext by showing that the proffered reason[] (1) had no basis in fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Id.* (citations and internal quotation marks omitted). "Pretext is a commonsense inquiry: did the employer [take action] for the stated reason or not?" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)).

In this case, Cotton argues that he has evidence of pretext, including that (1) he did not receive any type of discipline or counseling during his employment until the months following his

first EEOC charge; (2) other judicial commissioners engaged in horseplay and pranks, but he, the only non-White judicial commissioner, was the only one disciplined in connection with the practice; (3) Mezzatesta, the individual injured by Cotton's prank, engaged in office pranks and "included himself into the practice" (Cotton Dep. 143); (4) many of the judicial commissioners slept during the night shift, including two who were promoted to supervisor; (5) "[m]ultiple judicial commissioner supervisors told Cotton that he could sleep during the night shift (Doc. No. 26, at 20), and other non-work-related activities were allowed on shift during down time, such as knitting and reading; (6) no investigation was made of the police officer complaints against Cotton; (7) the judges fielded complaints from law enforcement officers about other judicial commissioners, not just Cotton; (8) the judges reappointed Andy Prendergast as judicial commissioner, even though she was "rude and disrespectful to law enforcement and other individuals" and was the subject of "numerous complaints" (Doc. No. 28-2, Andre Dep. 54–56); and (9) the offer to reappoint Cotton to a temporary position was conditioned on the release of potential Title VII claims, which Cotton claims "demonstrates any alleged complaints about [him] were merely pretext" (Doc. No. 26, at 2).

Regardless, Cotton does not dispute that the incident that sent Mezzatesta to the hospital occurred, or that he slept on the job, or that the judges received complaints about him. He, therefore, cannot show that the proffered reasons for his non-renewal had no basis in fact. As to the question of whether the proffered reasons were sufficient to motivate and actually motivated the decision, there is also no dispute that no other judicial commissioner prank resulted in injury to a colleague. Both judges, and Taylor in particular, expressed outrage about the Mezzatesta incident, based on their view that Cotton had picked on a particularly vulnerable individual and then expressed no remorse for the fact that his conduct caused that individual injury. Moreover, it

is undisputed that, prior to that incident, the judges were not aware that any judicial commissioners engaged in office pranks, nor were they aware that any other judicial commissioners slept while on shift. And, although Andy Prendergast was reappointed in 2017 (but not in January 2021 (*see* Doc. No. 28-7, Prendergast Dep. 10)), despite her rudeness and the complaints against her, there is no evidence that Prendergast engaged in a prank that sent a colleague to the hospital or that she slept during her shifts. The plaintiff, in short, offers no evidence that calls into doubt the veracity or sufficiency of the defendant's proffered reasons for the adverse employment action.

In addition, Cotton provides no support for his conclusory assertion that the offer of a temporary appointment in exchange for his agreement to waive and release any possible claims against the County demonstrates that the decision to terminate him was pretextual. That the judges—who had already decided not to renew his appointment—were willing to extend his term by a few months, at the suggestion of the judicial commissioner supervisor, to allow Cotton to retire with thirty years of service does not suggest that they made up the reasons not to reappoint him. And conditioning such an offer on a waiver of claims is a not-uncommon business practice: the County offered Cotton a benefit, in consideration for his making a concession to the potential benefit to the County. The offer to extend his term in exchange for the waiver arose separately from, independently of, and subsequent to the decision not to renew his term as judicial commissioner. Finally (and perhaps more relevant to the retaliation claim discussed below), the judges were not aware that Cotton had lodged the second EEOC charge at the time they made this offer.

The court finds, based on the entirety of the evidence in the record, that Cotton has not produced evidence from which a reasonable jury "could reject the employer's proffered reason[s]." *Briggs*, 11 F.4th at 515. The County is entitled to summary judgment on his discrimination claim

arising from the August 2020 decision not to renew his appointment as judicial commissioner for a term beginning on September 3, 2020.

<blockquote>

5.     *Retaliation Claim Based on Non-Renewal of Appointment and Refusal to Sign the Release*

</blockquote>

Again, as set forth above, any retaliation claims based on the various failures to promote are time-barred or unexhausted. The plaintiff's remaining claims are that the non-renewal of his appointment in September 2020 was in retaliation for his EEOC charges and, potentially, that the refusal to offer him a temporary appointment was in retaliation for his refusal to sign the release of claims.

<blockquote>

a)     Legal Standards

</blockquote>

In the absence of direct evidence of retaliation, the court addresses Title VII retaliation claims, too, under "the familiar *McDonnell Douglas* burden-shifting framework." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). As with discrimination claims, this means that the plaintiff has the initial burden of establishing a *prima facie* case of retaliation by pointing to evidence sufficient to convince a jury that: (1) he engaged in activity protected under Title VII; (2) the County knew that he exercised protected rights; (3) an adverse employment action was subsequently taken against him; and (4) there is a causal connection between the protected activity and the adverse action. *Id.*; *Laster v. City of Kalamazoo*, 746 F.3d 714, 730–31 (6th Cir. 2014). If the plaintiff can establish his *prima facie* case, the burden then shifts to the defendant to offer a "legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802. If it does so, the burden of production shifts back to the plaintiff to demonstrate that the defendant's proffered reason was a mere pretext for discrimination. *Kenney*, 965 F.3d at 448.

b)       Non-Renewal of Appointment

The plaintiff readily meets three of the four elements of his *prima facie* case with respect to the non-renewal: he engaged in protected activity when he filed three different EEOC charges (in April 2018, December 2019, and December 2020); the County knew about the first charge and eventually learned about the other two; and Cotton suffered an adverse action when his appointment as judicial commissioner was non-renewed. The County asserts that it is entitled to summary judgment, because Cotton cannot establish the final element of his *prima facie* case— the causal connection between his protected activity and the County's decision not to renew his appointment when his term expired on September 3, 2020. The court agrees.

First, the August 2020 non-renewal decision could not have been in retaliation for Cotton's filing a third EEOC charge in December 2020. Rather, the non-renewal was the subject of, and the cause of, the third EEOC charge. The later event obviously could not have caused the earlier event.

The second EEOC charge, filed in December 2019, was not served on the County until October 2, 2020. As a result, it also could not have been the cause of the August 2020 non-renewal decision. Although the plaintiff attempts to show that there is a material factual dispute as to whether the County was served with that charge in December 2019, he offers no evidence that calls into question the evidence proffered by the defendant, specifically including (1) EEOC records showing that the emailed Notice to the County "bounced" in December 2019 and was not resent until October 2020, and (2) the County's Information Technology witness's testimony, explaining why the email bounced. The plaintiff also attempts to argue that a confusing email sent to Judge Andre's assistant, Amy Whirrett, on September 2, 2020 was sufficient to notify the defendant that Cotton had filed a second EEOC charge. Even if the court accepts as true the dubious proposition that this email, inquiring whether Whirrett represented Timothy Cotton in "matters concerning" an EEOC charge against Williamson County, was sufficient to notify the

County that Cotton had filed a second EEOC charge, the inescapable fact remains that the judges made the decision not to reappoint Cotton sometime in August 2020 and communicated that decision to Cotton at a meeting that took place on August 27, 2020, before Whirrett received the EEOC email. There is simply no evidence that the judges—decisionmakers for the County on this matter—were aware of the second EEOC charge when they made the decision not to reappoint Cotton.

This leaves the first EEOC charge, filed in April 2018, as the only protected activity upon which the plaintiff's retaliation claim could be based. The plaintiff argues that, although this charge was filed more than two years before the adverse action, the defendant's knowledge of that charge, in combination with other factors, is sufficient to give rise to an inference of causation. More specifically, he asserts that his protected activity took place two years into his four-year term. He could not be terminated at will during his term, but the judges non-renewed him at the first available opportunity following the filing of his EEOC charge. He also points to the facts that he was counseled in connection with the Mezzatesta incident in August 2018, shortly after he filed the EEOC charge, and was passed over for promotion to the supervisor position in February 2019, less than a year later. He argues that these events, considered together with the failure to renew his appointment in 2020 and the conditioning of the offer of a temporary appointment in exchange for a release of claims, are sufficient to satisfy his burden on summary judgment.

In *Kenney v. Aspen Technologies*, the Sixth Circuit noted that "[t]emporal proximity alone generally is not sufficient to establish causation" and that "[e]xceptions to this rule are 'rare,' even in instances involving relatively short time periods." 965 F.3d 443, 448–49 (6th Cir. 2020) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). In that case, the court held that a length of time of approximately two and one-half months between the plaintiff's protected

activity and the adverse employment action was not "standing alone, a convincing case for proving causation" and, therefore, that it was "up to [the plaintiff] to provide other indicia to support a causal connection." *Id.* at 449. The court recognized, in that context, that "temporal proximity coupled with evidence of heightened scrutiny may be enough to satisfy a Title VII plaintiff's burden on causation at the *prima facie* stage." *Id.*

The plaintiff here has not pointed to actual evidence of heightened scrutiny. Again, although he was counseled in connection with the Mezzatesta incident, his claim that the counseling amounts to heightened scrutiny falls flat in the face of evidence that no other such prank had previously resulted in injury to a disabled colleague and that the judges, prior to that incident, were not aware that any other judicial commissioners engaged in pranks. Perhaps, hypothetically, if the judges had chosen to attempt to terminate Cotton's appointment for cause at that point, rather than simply counseling him, the plaintiff could have made a showing of heightened scrutiny. A counseling memo that had no adverse effect on the terms of his employment and that was objectively warranted by the circumstances does not amount to heightened scrutiny or evidence of retaliation. Likewise, the judges explained that their decision not to consider promoting Cotton to the supervisory position in February 2019 was largely based on the maturity and experience of the supervisor they selected (*see* Doc. No. 28-2, Andre Dep. 67), and this decision was not made close in time to the filing of the plaintiff's EEOC charge.

The plaintiff is left only with the fact that he was non-renewed in 2020 more than two years after filing an EEOC charge that was based on his not being considered for the supervisor position in August 2017. The court is not persuaded by the plaintiff's argument that the judges took action to remove him at the first available opportunity following his 2018 EEOC charge, since they could have tried to remove him by ouster following the Mezzatesta incident, and the plaintiff has no

other evidence suggesting a causal connection between his protected activity and the adverse action. The plaintiff has failed to establish a *prima facie* case of retaliation in connection with his nonrenewal.

Regardless, even if he could establish a *prima facie* case, the court also finds that he cannot show that the defendant's reasons for the nonrenewal are pretext for retaliation, as explained above in connection with his discrimination claim. The defendant is entitled to summary judgment on this claim for this reason as well.

c)      Conditioning Temporary Appointment on Release of Claims

Finally, insofar as the plaintiff appears to be asserting that the refusal to reappoint him to a temporary position (as alleged in the Complaint) or to a permanent position (as alleged in the third EEOC charge) was in retaliation for his refusal to sign a waiver, this claim fails as well.

First, apparently in recognition of the absence of evidence to support it, the plaintiff appears to have abandoned any claim that the decision not to reappoint him for a third four-year term was based on his refusal to sign a waiver. It is now undisputed that, at the time he was offered the waiver, the judges had already notified him that he would not be reappointed for another four-year term. The waiver would only have been required in connection with the proposed temporary appointment that would have allowed Cotton to stay on as judicial commissioner until he reached thirty years of service with the County.

It is unclear whether Cotton is continuing to allege that the offer to extend his term temporarily was withdrawn in retaliation for his refusal to sign a waiver. It seems, instead, that he is now arguing only that the conditional offer of a temporary appointment itself is evidence that supports his assertion that the non-renewal of his appointment was discriminatory or retaliatory. (*See* Doc. No. 26, at 18 ("[C]onditioning Cotton's reappointment to a temporary appointment only if he released his Title VII claims, tellingly demonstrates causation."); *id.* at 25 ("This offer of

conditional, albeit temporary, re-appointment demonstrates any alleged complaints about Cotton were merely pretext.").)

Sixth Circuit precedent confirms that this type of conditional offer is not facially retaliatory. *See E.E.O.C. v. SunDance Rehab. Corp.*, 466 F.3d 490, 501, 502 (6th Cir. 2006) (holding that the defendant's merely offering to discharged employees a separation agreement that included a promise not to sue, in exchange for severance pay not otherwise owed to them, was not "facially" retaliatory).[9] In addition, the plaintiff would not be able to establish a *prima facie* case of retaliation premised upon this offer. To state a *prima facie* case of retaliation, as set forth above, the plaintiff must show that he *first* engaged in protected activity and *then* that the defendant took an adverse action. He must also show a causal connection between the first and second events. Here, the defendant's offer consisted of two parts simultaneously: a temporary position in exchange for a waiver of claims. The plaintiff rejected that offer. There was no subsequent retaliatory action premised upon the plaintiff's first engaging in protected activity. Bearing in mind that the defendant was not aware of the December 2019 charge at the time the offer was made, there can be no causal connection between it and the offer. And, to the extent the plaintiff is attempting to link the 2018 EEOC charge to the conditional offer, the court finds again, for the same reasons as those discussed above, that the plaintiff cannot show a causal connection between the offer of a temporary position in exchange for a waiver of possible claims and an event that took place two years previously, absent other evidence that would corroborate the existence of a causal connection.

---

[9] In *SunDance*, the court noted that the question of whether such a waiver would be enforceable was a wholly different question that it was not called upon there to address. *SunDance*, 466 F.3d at 501.

In sum, insofar as the plaintiff might be attempting to assert a retaliation claim premised upon the offer of a temporary appointment as judicial commissioner to allow the plaintiff to reach thirty years of service, conditioned on the plaintiff's signing a waiver, the defendant is entitled to summary judgment on that claim on the merits as well.

## IV.   CONCLUSION

For the reasons set forth herein, the court will grant the defendant's Motion for Summary Judgment (Doc. No. 21) in its entirety. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge